In re MOSERBETH
ASSOCIATES, I, L.P.

In re FORKS PROPERTIES, L.P.

In re WILLOW HILL
PROPERTIES, L.P.

Nos. 91–21066T, 91–21067T, 91–21068T.

United States Bankruptcy Court,
E.D. Pennsylvania.

July 19, 1991.

Alan Black, Black, McCarthy, Eidelman & Feinberg, Allentown, Pa., for petitioning Creditors.

Shari O. Halperin, Reigle & Gellert, Reading, Pa., for involuntary debtor.

## OPINION

THOMAS M. TWARDOWSKI, Chief Judge.

Before the court are the merits of the involuntary bankruptcy petitions filed against three limited partnerships. The petitioning creditors are Excavating Construction, Inc. ("ECI"), Adams Outdoor Advertising, Inc. ("Adams") and Morris Black & Sons, Inc. ("Morris Black"). The involuntary debtors are Moserbeth Associates I, L.P. ("Moserbeth"), Forks Properties, L.P. ("Forks") and Willow Hill Properties, L.P. ("Willow Hill"). We make the following findings of fact and conclusions of law.

### Findings of Fact

1. Moserbeth is a limited partnership whose general partners are Geneten, Inc. and Jefferson Equities, Inc. Up until January of 1991, Daniel D. Richards owned all of the shares of Geneten, Inc. In January of 1991, Mr. Richards transferred his shares of Geneten stock to his wife, Deborah Richards. Neither Mr. Richards nor Mrs. Richards have ever held an interest in Jefferson Equities, Inc.

2. Moserbeth owned the real estate known as Jefferson Estates.

3. Forks is a limited partnership whose general partner is Geneten, Inc.

4. Forks owned the real estate known as Ardsley Estates.

5. Willow Hill is a limited partnership whose general partners are Geneten, Inc. and Mr. Richards. Mr. Richards became a general partner in Willow Hill sometime in 1989 or 1990.

6. Willow Hill owned the property known as the Maidencreek project.

7. Mr. Richards is the president and sole shareholder of Glen Cross Corporation. Glen Cross was formed in 1984, prior to the formation of the limited partnerships, to

work on a variety of projects with various limited partnerships, other than the involuntary debtors. In addition, Glen Cross served in capacities other than general contractor on other projects.

8. Glen Cross served as the general contractor for each of the limited partnerships on the real estate projects known as Jefferson Estates, Ardsley Estates and the Maidencreek project. No written contracts existed between the limited partnerships, as owners, and Glen Cross, as general contractor, regarding these projects.

9. Mr. Richards is an attorney, but does not currently engage in the practice of law. Mr. Richards is also a meticulous businessman.

10. Significant differences exist between Glen Cross and the limited partnerships. Glen Cross is a corporation which observed corporate formalities. It maintained books, records and bank accounts separate from those maintained by the limited partnerships. It also had several employees (at one time it had forty employees), while the limited partnerships have no employees. Glen Cross used an accounting firm to serve its tax needs. Finally, most of the entities and individuals who hold an interest in the limited partnerships do not hold and never held an interest in Glen Cross. The only individual or entity who holds or ever held an interest in both Glen Cross and the limited partnerships is Mr. Richards.

11. Glen Cross had funds available from sources other than the limited partnerships, such as separate lines of credit, to pay the subcontractors who were working on the real estate projects.

12. ECI served as a subcontractor on the Jefferson Estates project, the Ardsley Estates project and the Maidencreek project. All payments made to ECI for work performed on these projects came from Glen Cross.

13. Adams performed advertising services for the Jefferson Estates project and the Maidencreek project.

14. On October 10, 1990, Morris Black obtained a default judgment against Glen Cross in the amount of $75,264.75 in the Court of Common Pleas of Northampton County. Thereafter, on October 19, 1990, Morris Black filed a praecipe for a writ of execution in the Northampton County case against the limited partnerships as garnishees.

### Conclusions of Law

1. ECI does not hold a claim against Moserbeth, Forks or Willow Hill. In the alternative, any claims which ECI may hold against Moserbeth, Forks or Willow Hill are the subject of bona fide disputes and cannot form the basis of an involuntary petition under 11 U.S.C. §§ 303(b) and (h)(1).

2. The work performed by ECI on the projects known as Jefferson Estates, Ardsley Estates and the Maidencreek project was performed by ECI pursuant to various contracts ECI held with Glen Cross. Written contracts existed between ECI and Glen Cross for the Jefferson Estates project and the Maidencreek project. (See Exhibits D1 and D2). ECI was not involved in the Ardsley Estate project from its inception, but rather was contacted by Glen Cross to perform the site work after the arrangement Glen Cross had with the original subcontractor proved to be unsatisfactory. Hence, no written contract existed between Glen Cross and ECI for the Ardsley Estates project.

3. At no time did ECI have a contractual relationship with Moserbeth, Forks or Willow Hill.

4. The documents admitted into evidence as Exhibits PC1, PC3 and PC5, which purport to be copies of contracts between ECI and Moserbeth, Willow Hill and Forks, respectively, are altered or forged. Specifically, the purported signatures of Daniel D. Richards on Exhibits PC1, PC3 and PC5 are merely photocopies of Daniel D. Richards' signature which were copied from another document and then superimposed on Exhibits PC1, PC3 and PC5. (See testimony of Robert O'Neill, Tr. 3, pgs. 61–86). We find persuasive Mr. O'Neill's testimony, which the petitioning creditors failed to rebut, that Exhibits PC1, PC3 and PC5 were

altered or forged. We also find Mr. Richards' testimony that he never instructed Mr. Healey, the President of ECI, to draft contracts between ECI and each of the limited partnerships and that he never executed any such contract or the purported contracts introduced as Exhibits PC1, PC3 and PC5 persuasive in light of Mr. Richards' background as an attorney and meticulous businessman, his obvious intent to structure the deals so that only Glen Cross, as the general contractor, would be liable to the subcontractors and his obvious intent to avoid all liability on the part of the limited partnerships, as owners, to the subcontractors. Given Mr. Richards' background and obvious intent, we find it incredibly difficult to believe that he would ever sign a document that would render the limited partnerships liable to ECI or any other subcontractor for work performed in connection with the real estate projects.

5. Adams does not hold a claim against Moserbeth or Willow Hill.[1] In the alternative, any claims which Adams may hold against Moserbeth or Willow Hill are the subject of bona fide disputes and cannot form the basis of an involuntary petition under 11 U.S.C. §§ 303(b) and (h)(1).

6. The advertising services performed by Adams on the projects known as Jefferson Estates and the Maidencreek project were performed by Adams pursuant to written contracts it held with Glen Cross. (See Exhibits PC7 and PC10).

7. At no time did Adams have a contractual relationship with Moserbeth or Willow Hill.

8. The documents admitted into evidence as Exhibits PC7 and PC10 have been altered. Specifically, the "c/o" designations which appear on these exhibits were not on the original contracts when they were executed by Mr. Richards. Rather, the "c/o" designations were added to the contracts after they were executed by Mr. Richards, as President of Glen Cross, to make it appear that Moserbeth and Willow Hill, respectively, were the contracting parties and not Glen Cross. We find Mr.

Richards' testimony that the "c/o" designations were not on the contracts when he executed them persuasive in light of Mr. Richards' background as an attorney and meticulous businessman, his obvious intent to structure the deals so that only Glen Cross, as the general contractor, would be liable to the subcontractors and his obvious intent to avoid all liability on the part of the limited partnerships, as owners, to the subcontractors. Given Mr. Richards' background and obvious intent, we find it incredibly difficult to believe that he would ever sign a document that would render the limited partnerships liable to Adams or any other subcontractor for services performed in connection with the real estate projects. We also find persuasive Mr. Richards' testimony that the "c/o" designations hand printed on Exhibits PC7 and PC10 were not the hand printing of Morgan St. John, who at one time was an employee of Glen Cross, and the testimony of Mr. Richards and Mr. O'Neill that the "c/o" designations hand printed on Exhibits PC7 and PC10 were not Mr. Richards' hand printing.

9. Morris Black does not hold a claim against Moserbeth, Forks or Willow Hill. In the alternative, any claims which Morris Black may hold against Moserbeth, Forks or Willow Hill are the subject of bona fide disputes and cannot form the basis of an involuntary petition under 11 U.S.C. §§ 303(b) and (h)(1).

10. Morris Black did not meet its burden of proving that the limited partnerships were in possession of property belonging to Glen Cross either at the time the writ of execution was served or anytime thereafter. Moreover, it is well established that an unliquidated claim for breach of contract cannot serve as the basis for a garnishment unless the amount of recovery can be ascertained by reference to the contract between the defendant (i.e., Glen Cross) and the garnishee (i.e., the limited partnerships). *London Grove Contractors, Inc. v. J. Robert Pierson, Inc. (Matter of J. Robert Pierson, Inc.)*, 44 B.R. 556, 559 (E.D.Pa.1984) (in general, where the claim

---

1. Adams does not assert that it holds a claim against Forks and did not join as a petitioning creditor in the involuntary petition filed against Forks.

of the defendant against the garnishee is undetermined, neither the defendant nor the garnishing creditor can compel payment). Instantly, the petitioning creditors failed to establish that the limited partnerships owed any money to Glen Cross, let alone a specific amount. Therefore, the writ of execution served upon the limited partnerships was ineffective under Pa.R. Civ.P. Nos. 3101(b), 3111(b) or 3147 to create a lien of garnishment, and was also ineffective to create a claim against the limited partnerships within the meaning of 11 U.S.C. § 101(5)(A) and (B). In the alternative, any claims against the limited partnerships based upon the writ of garnishment execution are the subject of bona fide disputes and cannot form the basis of an involuntary petition under 11 U.S.C. §§ 303(b) and (h)(1).

■ 11. The petitioning creditors have not met their burden of proving that the limited partnerships should be held liable for the debts owed to them by Glen Cross based upon an alter ego liability theory or a corporate veil piercing theory. *See, B.D.W. Associates, Inc. v. Busy Beaver Building Centers, Inc.,* 865 F.2d 65 (3rd Cir.1989); *Schmid v. Reid (In re Reid),* 773 F.2d 945 (7th Cir.1985). In fact, the petitioning creditors never specifically raised these theories during the hearings held on this matter and never discussed these theories in their memorandum.[2] Unlike the petitioning creditors in *B.D.W. Associates, Inc.,* the petitioning creditors in this case have not introduced evidence sufficient to establish the elements necessary to impose alter ego liability or pierce the corporate veil, *B.D.W. Associates, Inc. v. Busy Beaver Building Centers, Inc.,* 865 F.2d at 68. Any alter ego liability claim or corporate veil piercing claim which might

have been raised by the petitioning creditors is the subject of a bona fide dispute, *In re Reid,* 773 F.2d at 947, and, therefore, cannot form the basis of an involuntary petition under 11 U.S.C. §§ 303(b) and (h)(1).

For the reasons set forth above, we find that the involuntary petitions must be dismissed.

2. As stated previously, the memorandum filed by the petitioning creditors does not discuss the imposition of alter ego liability or corporate veil piercing liability upon the limited partnerships. Instead, it focuses only upon the arguments that ECI and Adams had direct contractual relationships with the limited partnerships and that Morris Black has a claim against the limited partnerships within the meaning of 11 U.S.C. § 101(5)(A) and (B) based upon the writ of garnishment execution. We unequivocally reject these arguments and raise the alter ego liability theory and the corporate veil piercing theory only because they might have been vaguely alluded to during the hearings held on this matter and they were discussed by the limited partnerships in the portion of their memorandum devoted to ECI's alleged claim. We assume that since the petitioning creditors never raised these theories, they are not relying upon them to support the involuntary petitions.