

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-9-1998

# Henkels & McCoy Inc v. Adochio

Precedential or Non-Precedential:

Docket 97-1170

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Henkels & McCoy Inc v. Adochio" (1998). *1998 Decisions.* Paper 40.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/40

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1170

HENKELS & McCOY, INC.

v.

ROBERT ADOCHIO, RALPH ANDERSON, ROBERT
BADER, RALPH BARUCH, JOHN BUCK, ALAN
GOLDBERG, FRED GREEN, LEONARD C. GREEN,
C. BRUCE JOHNSTONE, HERBERT KAUFER, BILL
LUCAS, WILLIAM MILLER, ARTHUR ROTHLEIN, EDWARD
ROWAN, JOSEPH SCUTELLARO, CONRAD STRUDLER,
BARRY WAGENBERG, ARTHUR WELLMAN, JAMES R.
WILLING, and CHESTER DAVIS

Ralph Anderson, Robert Bader, Ralph Baruch, John Buck,
Fred Green, Leonard C. Green, C. Bruce Johnstone,
Herbert Kaufer, Bill Lucas, Arthur Rothlein, Edward
Rowan, Joseph Scutellaro, Barry Wagenberg, Arthur
Wellman, James R. Willing and Chester Davis,

        Appellants

An Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. No. 94-cv-03958

Argued: October 15, 1997

Before: STAPLETON, ALITO, and ROSENN, Circuit Judges.

(Opinion Filed March 9, 1998)

Robert J. Stern
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
Philadelphia, PA 19103
Counsel for Appellee

Roger B. Kaplan
Wilentz, Goldman & Spitzer
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, NJ 07095
Counsel for Appellants

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents an important question pertaining to the obligation of limited partners to return capital contributions distributed to them in violation of their partnership agreement which required that they establish reasonably necessary reserves. The issue is rendered complex by an interrelated maze of corporations and partnerships devised by the limited partners and the general partner in their efforts to develop two separate real estate projects. One of these, Timber Knolls, was aborted shortly after conception, and the other, Chestnut Woods, became the genesis of protracted litigation and of this appeal.

The defendants-appellants are limited partners of Red Hawk North Associates, L.P. (Red Hawk) L.P., a New Jersey limited partnership. G&A Development Corporation (G&A) is the general partner of Red Hawk. Cedar Ridge Development Corporation (Cedar Ridge), a New Jersey corporation, and Red Hawk entered into a joint venture agreement, the Chestnut Woods Partnership (Chestnut), to develop, construct, and market residential homes in Bucks County, Pennsylvania. Red Hawk and Cedar Ridge are both general partners of Chestnut Woods. Under the joint venture agreement, Red Hawk would provide the funding and Cedar Ridge would provide the land which it previously

2

had agreed to purchase. Cedar Ridge would act as the managing partner and general contractor.

On December 29, 1989, Cedar Ridge, as general contractor for Chestnut Woods, entered into a written subcontract with Henkels & McCoy, Inc. (Henkels), the plaintiff herein, to have it furnish the labor, materials, and equipment for the installation of the storm and sanitary sewer systems for the project. Cedar Ridge agreed to pay Henkels a fixed-price of $300,270 under the contract. Henkels completed the installation of the storm and sewer systems but Chestnut Woods defaulted in making the payments due under the contract. Henkels, a Pennsylvania corporation, then filed three actions in the United States District Court for the Eastern District of Pennsylvania; Henkels filed the first in December 1990 against Cedar Ridge and Red Hawk, trading as Chestnut Woods, for the balance due on the contract plus interest. The court entered a default judgment which was not satisfied in whole or part.

Henkels then filed suit against G&A in its capacity as a general partner of Red Hawk and obtained a default judgment in the same amount as it had obtained against Cedar Ridge and Red Hawk. Efforts to obtain payment on this judgment also proved fruitless and counsel for the defendants advised plaintiff 's counsel by letter dated October 26, 1993 that Red Hawk was worthless. Henkels' counsel also had been advised that G&A was unable to pay the judgment out of its assets.

Henkels finally brought this suit against the nineteen limited partners of Red Hawk (the Partners), standing in the shoes of the Red Hawk limited partnership; sixteen of the partners are parties to this appeal. Henkels sought, inter alia, to compel replacement of certain capital distributions made by Red Hawk to the limited partners aggregating $492,000 during the period that Cedar Ridge was obligated under its contract with Henkels to pay Henkels $300,270. Henkels alleged that the capital distributions were made in violation of the Red Hawk limited partnership agreement and S 42:2A-46(b) of the New Jersey Uniform Limited Partnership Law of 1976 (New Jersey ULPL).

3

After the district court denied both Henkels's and the Partners' motions for summary judgment,[1] it conducted a bench trial and on January 6, 1997, entered judgment in favor of Henkels. The court held each limited partner of Red Hawk liable to Henkels for his proportionate share of liability in the total amount of $371,101.84 plus interest to the date of payment of any judgment. The Partners appealed. We affirm.[2]

I.

The following facts are undisputed and are based upon the stipulation of the parties and the findings of fact made by the district court. The Red Hawk partnership, consisting of 20 (1 deceased)[3] limited partners and one corporate general partner, G&A, was formed in 1986. Pursuant to their partnership agreement, the Partners contributed $3.5 million in capital which ultimately they allocated to two distinct partnership projects, Timber Knolls and Chestnut Woods.

In 1987, Red Hawk and Cedar Ridge entered into a joint venture agreement forming the Chestnut Woods Partnership, with both Red Hawk and Cedar Ridge as general partners. Under the joint venture agreement, Red Hawk would provide the capital funds for the project and Cedar Ridge would provide the general management and assign its contract for the purchase of the land. Red Hawk funded the Partnership with an initial capital contribution of $650,000 (and an additional contribution of $200,000 in 1988). Cedar Ridge agreed to act as both the managing partner and the general contractor of the Chestnut Woods project. In addition, Cedar Ridge had the right to incur

_____

1. Henkels & McCoy, Inc. v. Adochio, 906 F. Supp. 244 (E.D. Pa. 1995).

2. The district court had jurisdiction over this matter pursuant to 28 U.S.C. S 1332, as it is a civil action involving parties of diverse citizenship and the amount in controversy at the time the suit was filed in 1994 was in excess of the then existing $50,000 jurisdictional amount. This Court has appellate jurisdiction of the district court's final
order pursuant to 28 U.S.C. S1291.

3. Conrad Strudler, a limited partner, died before trial and was no longer a defendant.

4

liabilities on behalf of the partnership in connection with the partnership's reasonable and legitimate business, borrow money in the name of the partnership, and incur reasonable and legitimate expenses related to the Chestnut Woods property. Work on the Chestnut Woods project subsequently commenced.

In 1988, Red Hawk and Cedar Ridge entered into a second and distinct joint venture agreement to form the Timber Knolls partnership, under which both Red Hawk and Cedar Ridge were also general Partners. Red Hawk contributed $2.3 million to the Timber Knolls partnership and Cedar Ridge again agreed to act as both the managing partner and the general contractor of the project. Unlike the Chestnut Woods project, the Timber Knolls project never commenced operations. Therefore, in 1988, the Red Hawk Partners entered into an agreement with Cedar Ridge requiring the latter to return Red Hawk's $2.3 million capital contribution. As evidence of this obligation, Cedar Ridge executed promissory notes aggregating $2.3 million with interest and principal payable quarterly.[4] Cedar Ridge made quarterly payments to Red Hawk on the notes, and G&A distributed these payments to the individual Red Hawk Partners, as follows:

|  | Payments by Cedar Ridge to Red Hawk | Distributions by G&A to the Red Hawk |
|---|---|---|
| Date | On the Notes | Partners |
| (1) Jan. 1989 | $ 78,750 | $ 76,200 |
| (2) April 1989 | $215,000 | $207,900 |
| (3) July 1989 | $215,000 | $207,900 |
| Totals | $508,750 | $492,000 |

Meanwhile, on December 29, 1988, Cedar Ridge, in its role as general contractor of Chestnut Woods, bound itself to a $300,270 fixed-price contract with Henkels, under which Henkels agreed to furnish and install storm and

_____

4. Each note initially called for quarterly interest of $78,750 only, with balloon payments of principal due on the third quarter of each year. In addition, the $2.3 million due was subsequently reduced to $2.1 million, with $200,000 transferred to Red Hawk's stake in Chestnut Woods, thereby increasing its investment to $850,000.

5

sanitary sewer systems for the Chestnut Woods development. The contract identified Cedar Ridge as the "General Contractor," Henkels as the "Subcontractor," and Chestnut Woods as the "Property Owner." The contract did not mention the relationship between Cedar Ridge and the Chestnut Woods Partnership, and made no reference to Red Hawk. It provided that the General Contractor, Cedar Ridge, was obligated to pay Henkels, payments to be made against billed invoices 30 days after approved inspection. At that time, Henkels was unaware that Cedar Ridge and Red Hawk were partners in Chestnut Woods.

On January 16, 1989, Henkels commenced the installation of the Chestnut Woods storm and sewer systems and completed the work according to the contract in late 1989. Under the contract, Cedar Ridge was required to pay Henkels in progress payments as invoiced. Accordingly, Henkels invoiced Cedar Ridge and received payments as follows:

| Invoice Date | Invoice Amount | Invoice Status |
|---|---|---|
| (1) Feb. 24, 1989 | $ 37,632 | paid in full  4/4/89 |
| (2) May 24, 1989 | $ 33,421 | paid in full 7/6/89 |
| (3) Aug. 14, 1989 | $215,175 | only $25,000 paid on 10/19/89 |
| (4) Sept. 28, 1989 | $ 37,183 | no payment |
| (5) Nov. 9, 1989 | $ 10,586 | no payment |
| | $333,996 | Total amount paid = $ 96,053 |
| | | Total amount unpaid = $237,943 |

Thus, Henkels received a partial payment in October on its August invoice and no payments on its September and November invoices, leaving a total unpaid balance of $237,943. G&A, the general partner for Red Hawk, failed to establish any reserves from the cash receipts of the limited partnership.

On March 16, 1990, Cedar Ridge sold its assets to Red Hawk. Shortly thereafter, in April 1990, G&A agreed with Henkels to pay Cedar Ridge's outstanding obligations to it, including accrued interest. However, Cedar Ridge paid only two small payments aggregating $8,000.

On December 19, 1990, Henkels sued Cedar Ridge and Red Hawk, trading as Chestnut Woods, claiming breach of

the installation contract and the April 1990 agreement, unjust enrichment, and conspiracy to defraud. Henkels obtained judgment against Cedar Ridge and Red Hawk in the amount of $282,421.55, including interest. Cedar Ridge and Red Hawk were unable to satisfy this judgment, in whole or in part.

In June 1992, Henkels sued G&A in its capacity as general partner of Red Hawk for the amount of the judgment previously obtained against Cedar Ridge and Red Hawk. On August 12, 1992, the Henkels obtained a default judgment against G&A in the sum of $282,424.55 plus interest at 6% per annum from October 15, 1991. When Henkels learned that G&A was unable to satisfy this judgment in whole or in part, it filed the instant suit seeking to have the Partners return to Red Hawk the cash capital distributions they received in 1989 as limited partners so that Red Hawk could satisfy the judgment obtained by Henkels against it.

The parties stipulated in the district court that the distributions made to the Red Hawk limited partners constituted a return of capital and that the distributions did not violate the New Jersey Limited Partnership Act. The district court concluded, however, in a careful and thorough opinion, that Paragraph 12(a) of the Red Hawk agreement of limited partnership governed the distribution of all cash receipts, except those derived from the operation of the property, and found that the payments on the promissory note from Cedar Ridge to Red Hawk did not constitute cash receipts derived from operations. It therefore held that the general partner was obligated to follow the mandate of Paragraph 12(a)(iv) of the partnership agreement which required the establishment of reasonable reserves prior to distributing cash receipts to the limited partners.

The district court found that the general partner in Red Hawk failed to establish any reserves and that Red Hawk had knowledge of its contingent obligations in the Chestnut Woods project and knew or should have known of the strong potential that the assets of Chestnut Woods would not cover the expenses it continued to incur for site improvements by Henkels and for which Red Hawk was

7

ultimately responsible. Accordingly, it held that Red Hawk violated the partnership agreement by failing to establish reasonable reserves to cover the cost of the site improvements made by Henkels.

The court accordingly entered a verdict in favor of Henkels and against the Partners individually for their proportionate share of liability in accordance with the monetary sums set forth in its conclusions of law in the total amount of $371,101.84 to date plus interest to the date of payment of any judgment.

The Partners appealed.

II.

On appeal, the Partners contend that the district court erred in holding that at the times of the distributions by Red Hawk to its limited partners, Henkels was a creditor of Red Hawk and that the distributions were made in violation of the partnership agreement. They also argue that even if Henkels were a creditor of Chestnut Woods, Red Hawk, as a Chestnut Woods partner, was not jointly and severally liable for the partnership debts (as a guarantor of payment) but rather only contingently liable as a guarantor of collection, and then only in the event Henkels obtained a judgment against the Chestnut Woods Partnership and failed to collect on such judgment.

This Court reviews a district court's construction and application of the New Jersey Uniform Limited Partnership Law de novo. See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991); Schreiber v. Kellogg, 50 F.3d 264, 266 (3d Cir. 1995). However, whether Red Hawk and G&A breached the Red Hawk limited partnership agreement by failing to establish reasonably necessary reserves, and thus the Partners ultimately received the distributions in violation of the agreement, is a mixed question of law and fact. Accordingly, this Court exercises plenary review of the legal operation of the partnership agreement, but will vacate the district court's contract interpretations and subsidiary factual findings only if they are clearly erroneous. See Cooper Lab., Inc. v. International Surplus Lines Ins. Co., 802 F.2d 667, 671 (3d Cir. 1986); Ram Constr. Co., Inc. v.

8

American States Ins. Co., 749 F.2d 1049, 1053 (3d Cir. 1984).

As a preliminary matter, we must first address the Red Hawk Partners' argument that Henkels was not a creditor who had extended credit to Red Hawk at the time of the 1989 capital distributions, and therefore the Partners were not liable to Henkels. The Partners base their argument on Section 42:2A-46(a) of New Jersey's ULPL, entitled "Liability upon return of contribution," which provides

> a. If a limited partner has received the return of any part of his contribution without violation of the partnership agreement or this chapter, he is liable to the limited partnership for a period of one year thereafter for the amount of the returned contribution, but only to the extent necessary to discharge the limited partnership's liabilities to creditors who extended credit to the limited partnership during the period the contribution was held by the partnership.

N.J. Stat. Ann. S 42:2A-46(a) (emphasis added). The Partners' reliance on this section is, however, misguided for several reasons: first, and most importantly, Henkels brought suit under Section 42:2A-46(b) not (a); second, subsection (b) is not in any way dependent upon nor does it even make cross reference to subsection (a); third, subsection (b) does not require that Henkels have extended credit or have been a creditor, nor does it even mention the word "creditor." Finally, subsection (b) addresses an entirely different concern than subsection (a): contributions made in violation of a partnership agreement or the New Jersey ULPL as opposed to distributions made without such violations but to the prejudice of creditors. Accordingly, Section 42:2A-46(a) is irrelevant to the issues raised on this appeal.

Our analysis does not end with this conclusion, however, because as just mentioned, Henkels does allege that the distributions made by G&A to the Partners were illegal under Section 42:2A-46(b) of the New Jersey ULPL. Henkels specifically alleges that the distributions violated the New Jersey ULPL because they were made in violation of the Red Hawk partnership agreement. Accordingly, we confine our

9

analysis to the relevant sections of the partnership agreement in conjunction with Section 42:2A–46(b) which, in its entirety, reads as follows:

> b. If a limited partner has received the return of any part of his contribution in violation of the partnership agreement or this chapter, he is liable to the limited partnership for a period of six years thereafter for the amount of the contribution wrongfully returned.

(emphasis added). Section 12(a) of the Red Hawk partnership agreement specifically provided that cash receipts be used for the establishment of reasonable reserves (for creditors) before such receipts be distributed to the Partners.5 The Partners contend that the distributions were not made in violation of the partnership agreement because Henkels, under the sewer subcontract, at most was a creditor of only Cedar Ridge, not of either Chestnut Woods or Red Hawk. Thus Red Hawk, they argue, was not required to establish reserves. Pursuant to this reasoning, the Partners assert that because Henkels was not a creditor, they did not receive the 1989 distributions in violation of the partnership agreement and thus did not violate the New Jersey ULPL.

The district court, however, committed no error when it found that Henkels was a creditor of Red Hawk even though Henkels was not in direct contractual privity with either Chestnut Woods or Red Hawk. The Partners contend that this was in error and that they could not be liable to Henkels because Cedar Ridge was acting solely in its capacity as general contractor and not as a partner in Chestnut Ridge when it entered into the contract with Henkels. Thus they contend that the contract did not bind Chestnut Woods or Red Hawk in any way.

_____

5. Section 12, in pertinent part, provides that:

> (a) Application of Cash Receipts.  Cash receipts shall be applied in the following order of priority:
>
> . . .
>
> (iv) to the establishment of such reserves as the General Partner shall reasonably deem necessary; and
>
> (v) to distributions to the Partners . . .

In support of their argument, the Partners note that the Subcontract Agreement with Henkels identifies Cedar Ridge as the "General Contractor," Henkels as the "Subcontractor," makes no mention of Red Hawk, and merely lists the Chestnut Woods Partnership as the "Property Owner." The contract, signed only by Henkels and Cedar Ridge, also states that Henkels shall invoice and be paid by Cedar Ridge, and provides that the Chestnut Woods property shall not serve as security for payment or be subjected to liens. The Partners also consider significant that Henkels acknowledged that the contract was with Cedar Ridge only and that Henkels had no knowledge that Cedar Ridge or Red Hawk were partners in Chestnut Woods. The Partners argue that these facts conclusively establish that Cedar Ridge entered into the contract solely in its capacity as general contractor, not as a general partner of Chestnut Woods, and therefore Cedar Ridge is solely liable under the contract.[6]

This "two hats" argument, although creative, is merely one of form over substance, ignoring the essence of the Chestnut Woods partnership agreement as well as fundamental principles of agency and partnership law which largely control the outcome of this case. First, the essence of the Chestnut Woods partnership agreement was that Red Hawk would "fund the PARTNERSHIP" by providing the capital with which to develop the property, while Cedar Ridge would contribute its development expertise by "act[ing] as the MANAGING PARTNER and GENERAL CONTRACTOR." (App. 76a, "Joint Venture Agreement, Chestnut Woods Partnership"). Thus, when Cedar Ridge signed the contract with Henkels as General Contractor, it simultaneously also was acting as a partner in the joint venture pursuant to its express authority to

_____

6. The Partners cite in their brief, In Re Moserbeth Assoc., 128 B.R. 716 (E.D. Pa. 1991), as support for this argument. Moserbeth, however, is inapposite. In Moserbeth, the general contractor was not itself a partner in the limited partnership, but instead was a separate and distinct corporation owned 100% by a partner in the partnership. This separate and distinct corporate identity was critical to the Moserbeth court holding that the partnership was not liable for the debts of the general contractor.

11

"act as the . . . GENERAL CONTRACTOR" as provided in the Chestnut Woods partnership / joint venture agreement. Second, it is elementary that "[e]very partner is an agent of the partnership for the purpose of its business, and the act of every partner . . . binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter." N.J. Stat. Ann. S 42:1-9(1); see also Eule v. Eule Motor Sales, 170 A.2d 241, 243 (N.J. 1961); Restatement (Second) of AgencySS 12, 140 (1958). This principle holds true even when, as here, the principal is undisclosed and the agent signs the contract in his individual capacity for the benefit of the partnership. But when a third party creditor ascertains an agency relationship, it may hold the partnership as principal liable (and ultimately the individual partners) even though the creditor was unaware of the agency relationship at the time that he extended the credit to the agent. See Looman Realty Corp. v. Broad St. Nat'l Bank of Trenton, 161 A.2d 247, 255- 56 (N.J. 1960) ("The principal, if discovered, may also be a party to the contract."); Levy v. Iavarone, 154 A. 527 (N.J. 1931) (seller can recover from partner, although seller did not know at the time credit was extended to the partner's agent that a partnership relationship existed between the partner and the agent); Yates v. Repetto, 47 A. 632, 633 (N.J. 1900) (when credit is given to an agent, and the principal is unknown, the creditor may elect upon disclosure of the principal, to hold either the agent or the principal liable); Moss v. Jones, 225 A.2d 369, 371 (N.J. Super. Ct. App. Div. 1966) ("If the existence of the principal is not known until after [a judgment against the agent goes unsatisfied], then the undisclosed principal may be sued, notwithstanding the judgment against the agent."); Restatement (Second) of Agency SS 186, 190, 194, 195 (1958).

Here, it is undisputed that Red Hawk was a partner with Cedar Ridge in the Chestnut Woods Partnership, that Cedar Ridge had actual authority to enter into the contract with Henkels,7 that the sewer systems were being installed for

_____

7. Paragraph 13.1(b) of the Chestnut Woods partnership agreement delegated to the managing partner, Cedar Ridge, general management

12

the benefit of the Chestnut Woods Partnership, and that Cedar Ridge was entitled to reimbursement from Chestnut Woods for all monies paid by Cedar Ridge to Henkels. Accordingly, the district court committed no error when it ruled that, although indirect, a creditor relationship existed between Red Hawk and Henkels based on the contract signed by Red Hawk's partner in the Chestnut Woods Partnership, Cedar Ridge.

The Partners also argue that the district court erred in finding that Henkels was a creditor of Red Hawk, because, even assuming arguendo that a contractual relationship existed between Red Hawk and Henkels, Henkels had not extended any credit to Cedar Ridge, Chestnut Woods, or Red Hawk. The unpaid invoices at issue here are from August, September, and November 1989, whereas the distributions to the Red Hawk Partners were made prior, in January, April, and July 1989. Therefore, the Partners claim that this is in itself prima facie proof that Henkels was not a creditor -- i.e., Henkels was not owed any money at the time of the distributions. These arguments, however, take a very narrow and ultimately erroneous legal view of the contractual relationship with Henkels and even a more constricted view of the definition of creditor.

Although the term creditor is undefined in the New Jersey ULPL and there is no New Jersey case law interpreting the term in this context, the term creditor is not foreign to New Jersey law. For instance, many New Jersey statutes define creditor very broadly to include "the holder of any claim, of whatever character, . . . whether

_____

authority and decision making power, including: "[t]he right to incur liabilities on behalf of the [Chestnut Woods Partnership] in connection with the reasonable and legitimate business of the [Chestnut Woods Partnership]." In addition, Paragraph 13.1(n) delegated the right and power "to enter into such contracts or agreements deemed necessary or appropriate on behalf of the [Chestnut Woods Partnership]." It is significant that these provisions, unlike paragraphs 13.1(d), (g), (j), (l), & (m), allowed Cedar Ridge to incur "on behalf of the [Chestnut Woods Partnership]," and did not require that it incur liabilities and enter contracts only "in the name of the [Chestnut Woods Partnership]." (emphasis added).

secured or unsecured, matured or unmatured, liquidated or unliquidated, absolute or contingent." See N.J. Stat. Ann. S 14A:14-1(b) (Business Corporation Act); N.J. Stat. Ann. S 15A:12-18(c) (Nonprofit Corporation Act); and N.J. Stat. Ann. S 25:2-7 (Uniform Fraudulent Conveyance Act) (repealed), & N.J. Stat. Ann. S 12A:6-109 cmt. (UCC Bulk Transfers) (repealed). Cf. City of Philadelphia v. Stepan Chem. Co., 713 F. Supp. 1491, 1493 n.3 (E.D. Pa. 1989) (to qualify as creditor, a party's claim must be based on "some legal foundation, such as an underlying debt, a contract, or a lawsuit"). Also, the statute is remedial in nature, "designed to protect creditors and should be interpreted with this purpose in mind." Henkels & McCoy, Inc., 906 F. Supp. at 252-53. In addition, the generic common law definition of creditor is very broad and

> includes every one having [the] right to require the performance of any legal obligation [or] contract, . . . or a legal right to damages growing out of [a] contract or tort, and includes not merely the holder of a fixed and certain present debt, but every one having a right to require the performance of any legal obligation [or] contract, . . . or a legal right to damages growing out of [a] contract or tort.

Black's Law Dictionary 368 (6th ed. 1990) (emphasis added). Finally, the failure of the statute to define creditor is indicative of the New Jersey legislature's intent that the term "creditor" be construed consistent with the New Jersey ULPL's broad remedial purpose and its common usage. See N.J. Stat. Ann. S 1:1-1 (General rules of construction). The district court cited many of these reasons and found them sufficiently persuasive, as do we, to adopt a broad definition of creditor which includes unmatured payments of a debt upon performance under a contract such as Henkels's.

Pursuant to the subcontract agreement, Henkels had a claim to payment for a fixed contract price to be paid in installments upon progressive completion of the sewer work. Although the Partners argue that Henkels did not have a claim at the time of the 1989 distributions, the contract between Henkels and Cedar Ridge was entered into on December 29, 1988. Thus Henkels and Cedar Ridge

14

had definite obligations to each other under the contract over a week prior to the first distribution by the general partner to the Red Hawk limited partners. Those obligations required Henkels to make the site improvements and Cedar Ridge to make scheduled payments as performance was rendered. In addition, G&A made the bulk of the distributions after Henkels had commenced work and was incurring costs and expenses in fulfilling its commitments under the contract. Thus Chestnut Woods and Red Hawk had incurred liability as early as December 29, 1988, although the bulk of the payment matured the month after the last distribution by Red Hawk to the Partners. The Partners' overly narrow definition of creditor is inconsistent with the obvious financial realities that existed at the time, the generally accepted common law meaning of the term, the broad definition used in other New Jersey statutory contexts, and the broad remedial purpose of the statute. Accordingly, we hold that under this broad definition and consistent with the principles of agency and partnership law previously discussed, Henkels was not only a creditor of Cedar Ridge, but of Chestnut Woods, and thus Red Hawk and its partners.

The Partners further argue that even if we conclude that Henkels was a creditor of Chestnut Woods, Red Hawk was not "jointly and severally" liable for the partnership's debts, but only "jointly" liable, as it was only a partner in Chestnut Woods. The Partners find this significant and contend that as a partner Red Hawk was only contingently liable as a guarantor of collection, not as a guarantor of payment. Furthermore, the Partners contend that even then Red Hawk was not liable until Henkels had obtained a judgment against the Chestnut Woods partnership, was unable to collect, and then sought payment from Chestnut Woods's partner, Red Hawk. Therefore, the Partners conclude, Henkels was not a creditor of Red Hawk until this eventuality ultimately did occur in October 1991-- more than two years after the distributions. Thus, they assert there was no violation of Section 42:2A-46(b) or the partnership agreement. Although the Partners make much of the distinction between "joint" and "joint and several liability," and between "guarantor of collection" and

15

"guarantor of payment," the distinctions between these terms are illusory here and are not dispositive.

Under the New Jersey ULPL, partners are only jointly liable for contract obligations of the partnership, and thus a contract creditor of the partnership must first exhaust the partnership's assets before it can pursue the assets of the individual partners. See N.J. Stat. Ann. S 42:1-15(b). The Partners dwell on their argument that joint liability means that partners are merely guarantors of collection rather than guarantors of payment, citing Seventy-Three Land, Inc. v. Maxlaw Partners, 637 A.2d 202 (N.J. Super. Ct. App. Div. 1994). They contend that this distinction means that Henkels was not a creditor of Red Hawk until after it obtained a judgment against Red Hawk's assets in October 1991, "long after the distributions to the limited partners were made."

This argument is without merit, however, because the Partners overly emphasize the distinction between guarantor of collection and guarantor of payment by ignoring the sentence in Seventy-Three Land, Inc. immediately preceding the courts' discussion of this distinction; that sentence actually supports an opposite conclusion. The court in Seventy-Three Land, Inc. merely stated that "[p]artners are liable for partnership contract debts, but their assets are not at risk until it is shown that the partnership cannot discharge the debt." Id. at 204 (emphasis added). This language, consistent with the broad definition of creditor previously discussed, clearly demonstrates that jointly liable partners such as Red Hawk do have a present liability. The significance to the Red Hawk Partners is that payment of that liability out of their individual assets is contingent, rather than fixed, until the partnership's assets are first exhausted. Although the Partners' individual assets were only contingently at risk, the Partners nonetheless were liable to Henkels from the time the contract was signed and, as ultimately did happen, their assets did become available when the Red Hawk partnership's assets proved insufficient to meet its debt with Henkels.

Accordingly, we hold that the district court's finding that Henkels was a creditor of Red Hawk was correct. See

16

Henkels & McCoy, 906 F. Supp. at 252–53. At the time of the 1989 distributions, Henkels was a creditor of Red Hawk and the individual Red Hawk partners were liable for that debt.8

III.

Although Henkels was a creditor of Red Hawk, the 1989 distributions were in violation of the partnership agreement only if, as Henkels argues, Red Hawk's distributions constituted a failure to abide by the partnership agreement's requirement to establish reasonably necessary reserves. The Partners, however, contend that the district court made several errors in interpreting the Red Hawk partnership agreement which resulted in its finding that the distributions were in violation of the agreement by failing to establish such reasonable reserves.

Section 9(b) of the partnership agreement grants the general partner, G&A, certain rights and powers, including, under subsection (ix), the power "to establish reasonable reserve funds from income derived from the Partnership's operations to provide for future . . . debt service or similar requirements." The Partners argue that this subsection is the only subsection of the agreement that permits or authorizes the general partner to reserve funds. Thus, according to the Partners, all reserves had to be (1) authorized by this subsection, (2) taken from income derived from operations, and (3) used for debt service. Therefore, had G&A reserved funds against the Henkels

_____

8. The dissent would extend our holding far beyond its limit. It concludes that the majority holds "by necessary implication. . . that a distribution could not be made to Red Hawk partners unless cash reserves had been established to fund the payment of all anticipated future liabilities of the
joint venture partnerships (owned in part by others) that might accrue over some unspecified period of time . . . ." Dissent at p. 30. We are not called upon in this case to decide whether reserves are required for "all anticipated future liabilities" and therefore the majority does not decide that question, either directly or by implication. The focus of our holding is merely that when there is clear liability under an existing contract, the
equity partners cannot ignore that liability, recapture their capital investments, and leave the creditor spinning in the wind.

17

contract, the Partners contend that such reserves would have been taken in violation of this subsection of the partnership agreement because the funds would not have been derived from operations but from distributions of capital.

The Partners' argument fails, however, because it selectively presents the language of Sections 9 and 12 and omits other relevant language which demonstrates that the Partners greatly overemphasize the significance of subsection (ix). First, the express language of Section 9(b) provides that the general partner possess all "rights and powers required for or appropriate to its management of the partnership's business which, by way of illustration but not by way of limitation, shall include the following: . . . (ix) to establish reasonable reserve funds from income derived from the partnership's operations to provide for future . . . debt service or similar requirements." This unambiguous language demonstrates that G&A had the right and power to establish reserves, even if not expressly authorized under subsection (ix), if it deemed them required or appropriate for the management of Red Hawk's business. The list of rights and powers in subsection (ix) is merely illustrative and is not an exclusive limitation on the general partner's rights and powers.

Equally important, as the district court properly found, the distributions at issue here were not taken from income derived from operations, but were merely returns of capital of the aborted Timber Knolls partnership, which, as Red Hawk admits, "never got off the ground." Income from "operations," as used in this subsection, refers to income derived from the active, normal, on-going activities of the partnership. Timber Knolls never functioned, and thus there never was any income from operations. Therefore, subsection (ix) is not applicable to the distributions at issue here.[9] It is completely irrelevant because the distributions

_____

9. This point is significant in interpreting Section 12(a) as well. Following the order of priority for the distributions of cash receipts in Section 12(a)(i)-(v) is a provision which prohibits the general partner from "retain[ing] and invest[ing] any Cash Receipts derived from the operations of the Property, except . . . (2) for investments of reserves permitted to be established under clause (ix) of Paragraph 9(b)." (emphasis added). Because the cash receipts used to fund the distributions were not derived from income from operations of Red Hawk property, this prohibition is not relevant to this appeal.

18

constituted capital funds retrieved by Red Hawk from its abandoned project, Timber Knolls. Although the Partners emphasize that the funds were derived from the Timber Knolls project, Subsection (ix) only addresses the reserving of funds derived from operations; the germinating project is immaterial.

Finally, as previously discussed, Henkels qualified as a creditor of Red Hawk at the time the distributions were made. Therefore, pursuant to Section 12(a) of the Red Hawk limited partnership agreement governing the distribution of all cash receipts, the Red Hawk general partner was required to establish reasonable reserves from the cash received on the Timber Knolls promissory notes to meet its ongoing liability before distributing such cash to the individual limited partners. We, therefore, turn to the issue as to what would constitute a "reasonable" reserve to meet the outstanding liability under the Henkels subcontract.

Although neither party provided the district court with any case law or treatise defining reasonable reserves, the court used the Black's Law Dictionary definition of "reasonable" and of "reserves" in the insurance context to define reasonable reserves in the business context before us. We agree with them that the insurance context is inappropriate for analysis because the nature of the insurance business differs significantly from that of an ordinary business partnership. Unlike an ordinary business partnership, an insurance company essentially is required to meet future, contingent obligations, and these reserves are required. The Partners instead propose that the highly deferential corporate "business judgment" standard is the appropriate standard. However, as Henkels correctly argues, the business judgment rule also is inapposite in the partnership context because it is a function of a unique corporate setting. See 3A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations SS1036-37 (perm. ed. rev. vol. 1994).

Although the New Jersey courts have not yet addressed the issue of what constitutes reasonable reserves, we do not need to expressly define reasonable reserves in the context of this case because it is unnecessary to the disposition of this appeal. See Rush v. Scott Specialty Gases, Inc., 113

19

F.3d 476, 486 (3d Cir. 1997) (declining to decide issues unnecessary to the appeal); Georgine v. Amchem Products, Inc., 83 F.3d 610, 623 (3d Cir. 1996) ("[W]e believe it prudent not to decide issues unnecessary to the disposition of the case."). Regardless of what standard the New Jersey courts will ultimately adopt, under any standard and using any definition of reasonable reserves, the Red Hawk general partner's failure to establish any reserves in the face of the fixed obligation and imminent payments due under the contract with Henkels and the operations of the Chestnut Woods development was callous and not reasonable.

It is undisputed that of the approximately $500,000 monies received by Red Hawk in 1989, the Red Hawk general partner (G&A) did not set aside any of these funds to establish reserves, even in the face of a contracted liability. Red Hawk argues, however, that this was not unreasonable because (1) the Red Hawk partnership had no liabilities and $3 million in assets at the time of the distributions; (2) Henkels had not yet invoiced Chestnut Woods; (3) the financial outlook of Red Hawk (& Chestnut Woods) was healthy; and (4) the express terms of the partnership agreement prohibited the taking of such reserves. Each of these contentions is without merit.

First, the $3 million of assets included on Red Hawk's January 1, 1989 balance sheet is somewhat illusory. Of the $3 million in assets, a scant $22,000 was in the form of cash or other liquid assets. The remaining were almost exclusively illiquid: the $800,000 investment in the Chestnut Woods project itself which consisted of land and infrastructure and the $2.1 million Timber Knolls notes receivable from Cedar Ridge -- which were substantially distributed to the limited partners. Neither of these assets were readily available to satisfy Red Hawk obligations, especially not after the payments on the notes were distributed to the partners. Moreover, Red Hawk repeatedly left almost no money in its checking account after each distribution to the Partners, other than several thousand dollars to cover incidental operating expenses. Additionally, the absence of any formal liabilities from its balance sheet and the failure of Henkels to physically invoice Cedar Ridge did not mean that Red Hawk had no liabilities; it simply

20

was an "off-balance sheet" liability. In the accounting profession, an "off-balance sheet" liability is a financial obligation that is not formally recognized in an entity's accounting statements because no "accounting" obligation arises until the exchange transactions is completed; nonetheless, they do have real current and future cash flow consequences. See Accountant's Handbook, 10.29 (7th ed. 1991). Under the broad definition of creditor established above, Red Hawk had an unmatured, fixed, off-balance sheet liability to Henkels.

Although by itself this may be not determinative, more telling is the Partners' failure to identify any other source of funds from which the Red Hawk Partnership would be able to meet its obligations, including its contract obligation to Henkels. The Timber Knolls project never got off the ground, literally and figuratively, and based on the record, Chestnut Woods generated no earnings during the 1989 tax year and Red Hawk generated none during both 1988 and 1989. Because the Chestnut Woods property was under development at the time, Chestnut Woods reported a loss during 1989 and Red Hawk reported losses on both its 1988 and 1989 tax returns, and both Chestnut Woods and Red Hawk appear to have had negative cash flows during these years. Without any other source of cash or liquid assets, short of liquidating the Chestnut Woods property itself, it clearly was unreasonable for G&A to distribute to the Partners Red Hawk's only available source of payment without setting aside any reserves to meet the Henkels debt.10

_____

10. As we noted above, see supra p. 10, under the New Jersey partnership statute and fundamental principles of agency law, every partner is an agent of the partnership and the act of every partner binds the partnership for the purpose of its business. Accordingly, the liability of the Red Hawk partnership to Henkels was committed by written contract between Henkels and Red Hawk's partner, Cedar Ridge, in December 1988, before any retrieval by the Partners of their capital investment in Timber Knolls. In addition, Red Hawk's project, Chestnut Woods, had current liabilities as of January 1, 1989, according to its tax returns, which disclosed debts of over $1.7 million. These liabilities also were in place prior to the retrieval of the Partners' investments in Red Hawk. Nevertheless, the dissent would relieve the Partners of any liability under the contract to creditor Henkels on the theory that from January to August 1989, Red Hawk "had no significant liabilities of any kind." Dissent at p. 29.

21

Second, and equally telling, G&A knew, or at least had ample notice, that the financial outlook of Red Hawk and Chestnut Woods was not as rosy at the time of the distributions as the Partners attempt to assert now. 11 For example, the Partners fail to mention or accurately state many of the following facts: (1) Red Hawk and G&A, in December 1988, received notification from Cedar Ridge that four separate and distinct types of delays in the Chestnut Woods project were resulting in additional financial burdens to it; (2) Cedar Ridge also informed Red Hawk that these financial burdens were worrisome given the decline already experienced in the housing market; (3) Red Hawk had a scant $22,000 in cash or other liquid assets on hand as of January 1, 1989; (4) Chestnut Woods had an equally scant $12,000 in cash or other liquid assets on hand as of January 1, 1989; (5) Chestnut Woods' January 1, 1989 balance sheet showed over $1.7 million in current liabilities, with the land and construction in progress of Chestnut Woods comprising over 90% of its $2.4 million in assets, leaving meager resources available to pay for the planned 1989 site improvements, such as the $300,000 of sewer systems from Henkels;12 (6) as of March 7, 1989, Red Hawk had, at a minimum, imputed knowledge from its bank's written notice that interest on the Chestnut Woods mortgage would no longer be paid out of the interest reserve fund and that Cedar Ridge was responsible to pay

_____

11. Even assuming arguendo that Red Hawk and G&A did not have actual notice or knowledge of the precarious financial condition of Chestnut Woods, "[t]here are many cases stating the general rule that knowledge of one partner [(Cedar Ridge)] will be imputed to the others." Harold Gill Reuschlein & William A. Gregory, The Law of Agency and Partnership S200 at 304 (1990); see also N.J. Stat. Ann. S 42:1-12 ("Knowledge to any partner of any matter relating to partnership affairs . . . operate[s] as notice to or knowledge of the partnership . . . ."); Claflin
v. Wolff, 96 A. 73, 79 (N.J. 1915) ("If any of [the partners] had notice or
knowledge . . . they would all be affected by it.").

12. Red Hawk states, and its 1989 tax return shows, that Chestnut Woods' assets were $2.4 million, not $1.8 million. Although the district court found the number to be $1.8 million, this difference is inconsequential; either amount consisted almost exclusively of the project's land and work-in-progress -- i.e., illiquid assets, leaving next to
nothing to pay its $1.7 million in current liabilities.

22

interest out of its own funds due to "the past unfortunate circumstances [which] caused slower than expected [progress on the Chestnut Woods project,]" and which caused the remaining interest reserve to become substantially depleted and potentially "insufficient to carry this loan;" and (7) the August 1989 $2.7 million appraisal of the Chestnut Woods project was merely a potential future retail estimate and contained the express caveat that this "value estimate[ ] assume[s] that all site improvements will be completed in a workmanlike manner and within a reasonable period of time."13

Finally, as previously discussed, the Red Hawk partnership agreement did not prohibit G&A from reserving funds for the payment of Henkels. Section 9(b)(ix) is merely an illustration of G&A's rights and powers and, because the funds at issue were not derived from operations, ultimately was irrelevant to the funds at issue. More importantly, Section 12(a) expressly required that the available cash funds be used to establish reserves before they were distributed to the Partners.

_____

13. The dissent ignores the foregoing realities of Red Hawk's and Chestnut Woods' financial straits while the Chestnut Woods project was still under development, and already beset by a negative cash flow in the project, while at the same time the Partners were retrieving all of their total capital investments in the Timber Knolls project. The dissent, again, would permit the Partners to escape liability in the face of Henkels' 1988 contract on the infirm premise that at the end of August 1989, when all partner contributions had been repaid, Chestnut Woods had the project appraised at $2.7 million and Red Hawk "had significant net worth throughout this period." Dissent at p. 30. In the first place, the appraisal obtained by Chestnut Woods was merely an optimistic, potential, retail figure dependent on the market price for the lots, when and if sold, and the completion of the project "in a workmanlike manner and within a reasonable period of time." Second, even if the appraisal of the project were accurate, the frozen nature of the real estate -- not yet marketable -- provided no liquid source for payment of ongoing obligations. To illustrate, it could not meet the payment due of $215,175 for the August delivery by Henkels. Further significant, Red Hawk and Chestnut Woods both reported losses during 1989, and both appear to have had negative cash flows. Both had meager sums of cash on hand, and Chestnut Woods had significant current liabilities with 90% of its assets frozen.

23

Although neither Henkels nor the district court attempted to determine what level of reserves was reasonable, no determination was needed because Red Hawk and G&A failed to establish any reserves. It is patently obvious that at least some level of reserves was reasonably necessary, and that the general partners' distributions and failure to reserve any money for the Henkels contract obligation, in light of Chestnut Woods' and Red Hawk's precarious financial condition, was unreasonable. Thus, the district court did not need to determine what level of reserves was reasonable; it clearly had an ample factual basis upon which to determine that the complete failure to establish any reserves was a violation of the Red Hawk partnership agreement's requirement that G&A establish some level of reserves before making distributions to the Partners. Accordingly, we hold that Red Hawk's failure to establish any reserves in light of both partnerships' then existing financial condition was not reasonable.

IV.

In conclusion, we find no merit to appellants' contentions. We see no error in the district court's conclusion that Henkels was a creditor of Red Hawk, and therefore the 1989 capital distributions to the Partners and failure to establish any reserves to fund its contract obligation to Henkels was a violation of the Red Hawk partnership agreement. The Partners are therefore obligated to return the improper capital distributions to Red Hawk. Because the plaintiff stands in the shoes of Red Hawk for the purpose of recovering these funds on behalf of the partnership, In re: Sharps Run Associates, 157 B.R. 766, 772–73 (D.N.J. 1993), and because of the multiple suits it already has been compelled to undergo to enforce collection of its debt, judicial resources will be conserved and economies of time and expenses effectuated, to hold the Partners directly liable to Henkels.

Accordingly, the judgment of the district court will be affirmed. Costs taxed against the appellants.

24

STAPLETON, Circuit Judge, Dissenting:

The critical issue posed by this appeal is one of intent – the intent of the Red Hawk partners when they negotiated their partnership agreement. Given the text of that agreement and the context in which it was executed, I believe the district court clearly erred when it interpreted Section 12(a)(iv) as precluding the three challenged payments to Red Hawk's limited partners.

The relevant facts are documented and undisputed. Red Hawk is a limited partnership organized under the New Jersey Uniformed Limited Partnership Law to facilitate the investment of its corporate general partner and its individual limited partners in two specific real estate developments. The sole declared purpose of the partnership was to participate in two joint ventures pursuant to identified, previously executed joint venture agreements, each of which would independently develop a parcel of real estate in Bucks County, Pennsylvania. The Timber Knoll joint venture was to develop the Timber Knoll property; the Chestnut Woods joint venture was to develop the Chestnut Woods property. In each instance, management of the joint venture was placed in the hands of an unrelated corporation with experience in the business of real estate development, the Cedar Ridge Development Corporation. The partners of Red Hawk contributed to it capital of $3.5 million. Of this capital, $2.3 million was committed to the Timber Knoll joint venture, and $850,000 was committed to the Chestnut Woods joint venture. It was understood that Cedar Ridge would be simultaneously involved in other real estate development projects in New Jersey, Pennsylvania, and other states.

Under the Chestnut Woods joint venture agreement, Cedar Ridge, as the "Managing Partner," was authorized to borrow money and to mortgage and sell assets. Red Hawk was to receive a Preferred Minimum Return on Capital prior to any distribution of profits to Cedar Ridge. The preferred return was equal to 15% "per annum based on simple interest payable quarterly on the amount of capital outstanding and not returned." J.A. at 91. However, "in the event the net cash working reserve of the [joint venture fell] below $500,000, the quarterly preferred return [could] be

25

deferred by the MANAGING PARTNER until the net cash working reserve has sufficient cash in excess of $500,000 to pay the unpaid preferred return." J.A. at 91-92. The agreement further provided that no partners would have "the right to compel a distribution of profits or cash, unless the [joint venture] has accumulated an unwarranted amount of cash not reasonably needed for future business activities." J.A. at 93-94. Red Hawk's capital contribution was to be returned at the minimum rate of $12,400 per lot sold after the sale of the first 20 lots. In addition, the managing partner committed itself to "make a good faith effort to make minimum annual cash distributions equal to thirty-five percent (35%) of the distributive share of profits allocated to each PARTNER" for tax purposes. J.A. at 94. Distributions could be made in cash or property.

It was in the context of this joint venture agreement and the similar Timber Knoll joint venture agreement that the Red Hawk Partnership Agreement was negotiated. Since the Red Hawk partners understood that cash flow would be coming to Red Hawk from the managing partner of the joint ventures only after Cedar Ridge had established reserves to service the only business operations in which Red Hawk would ever have an interest, the Red Hawk limited partners understandably sought assurance that joint venture profits and return of capital would not be accumulated in the Red Hawk partnership by its general partner, G&A.

The Red Hawk Partnership Agreement thus provided for a mandatory pass-through of cash receipts, whether generated by the joint ventures in the regular course of business or otherwise, after the general partner had paid all of the currently due debt obligations of Red Hawk and had set aside specifically limited reserves. Any reserves were expressly limited to such revenue from operations as the general partner, in its discretion, considered appropriate for the purpose of paying anticipated administrative expenses and, in the event of the distribution of joint venture property in kind, anticipated property management expenses. Section 12(a) of the agreement thus provided:

> (a) Application of Cash Receipts. Cash Receipts shall be applied in the following order of priority:

26

(i) to the extent required, to the creditors of the
Partnership, except to any Partner or any
Affiliate thereof;

(ii) to the extend required, to the payment of any
debts or liabilities to any Partner or any
Affiliate thereof (other than a loan to the
Partnership by the Partner);

(iii) to the payment in full of any loans to the
Partnership by a Partner;

(iv) to the establishment of such reserves as the
General Partner shall reasonably deem
necessary; and

(v) to distributions to the Partners in accordance
with Paragraphs 12(b) and (c) hereof.

Notwithstanding the foregoing, the General Partner
shall not retain and invest any Cash Receipts derived
from the operations of the Property, except (1) to defray
expenditures for any repair or improvement to any
Property, which it, in its sole discretion, deems
appropriate or (2) for investments of reserves permitted
to be established under clause (ix) of Paragraph 9(b)
hereof, nor shall the General Partner invest the net
proceeds derived and retained by the Partnership from
the sale or other disposition of any Property (including
any total condemnation or destruction of any portion of
the Property) except as otherwise provided herein.

J.A. at 274.

The term "Property" is defined in the Red Hawk
Agreement to mean "the Buildings and Land in Bucks
County, Pennsylvania." J.A. at 261. "Cash Receipts" means
"all cash receipts of the Partnership from whatever source
derived." J.A. at 259. Section 9 of that Agreement is entitled
"Rights and Duties of the General Partner." It imposes no
duty on the General Partner to set aside reserves for any
purpose. In subsection (b)(ix), the subsection referenced in
Section 12(a), the general partner is given the authority "to
establish reasonable reserve funds from income derived
from the Partnership's operations to provide for future

27

maintenance, repair, replacement, debt service or similar requirements." J.A. at 265.

Read in the context of the Agreement and the expectations of the Partners, it is apparent that the dominant portion of Sections 12(a) is the paragraph commencing with the clause "Notwithstanding the foregoing." Indeed, that lead clause requires that this paragraph be given controlling significance over the preceding text. It mandates disbursement to the partners of all cash whether received by Red Hawk in the course of the normal operations of the joint venture properties or whether received by it from dispositions of joint venture property other than in the course of its regular business operations. The two exceptions recognize that the General Partner, in its sole discretion, should have the ability to retain cash derived from operations to establish reasonable reserves for property repairs and improvement, debt service, and other operating expenses.

The subordinate portion of Section 12(a) that precedes the "notwithstanding" clause establishes the priorities among various interests that may compete for distributions of cash receipts. The purpose of subsection 12(a)(iv), in particular, is (1) to recognize the possibility that the General Partner may wish to withhold some funds pursuant to the two express exceptions from theflow through mandate; and (2) to emphasize that the General Partner's authority to do so is limited to such reserves as it might "reasonably deem necessary." Thus, subsection 12(a) is designed both to recognize the possibility of retention of cash receipts for authorized reserves at the discretion of the General Partner and, at the same time, to assure the limited partners that there will be no accumulation of even funds for reserves when the general partner, in the exercise of business judgment, could not reasonably regard them as necessary for the designated purposes.

The Timber Knoll project never got off the ground. The requisite governmental approvals for development were not obtained by the owner of the Timber Knoll site, and the property was never purchased by the joint venture. When it appeared that the objective of the joint venture would have to be abandoned, an amendment to the joint venture

28

agreement was executed that called for the conversion of Red Hawk's $2.3 million capital contribution into promissory notes of Cedar Ridge. Pursuant to these notes, payments were received by Red Hawk in January 1989, April 1989, and July 1989. These payments represented a return of the capital contribution made by Red Hawk to the Timber Knoll joint venture and interest accrued thereon after the conversion.

The Chestnut Woods project did get underway in late 1988. Cedar Ridge served the Chestnut Woods joint venture not only as managing partner, but also as "general contractor" for the site improvements. The site improvements were to be financed, at least in part, through bank borrowing. Among these improvements were, of course, storm and sanitary sewer systems. Cedar Ridge, in its capacity as "general contractor," contracted with plaintiff Henkels & McCoy in December of 1988. Henkels commenced its work at the Chestnut Woods site on January 16, 1989, shortly after Red Hawk received the first payment on the return of its capital contribution to the Timber Knoll joint venture.

In January, April and July of 1989, Red Hawk's general partner made the decisions that gave rise to this lawsuit. When each return of capital from the Timber Knoll project was received, G&A decided to deposit a few thousand dollars in Red Hawk's checking account to cover anticipated administrative expenses and to return the remainder to the limited partners. Henkels seeks to compel return of those distributions to Red Hawk for application to a default judgment it later obtained against Red Hawk.

During the period from January to August 1989, Red Hawk had satisfied its entire capital commitment to the Chestnut Woods joint venture, and it had no significant liabilities of any kind. It was receiving reports from Cedar Ridge that site improvements, after some initial delays, were progressing. Cedar Ridge estimated at the start of this period (i.e., December 1988) that, even without improvements, the entire property could be sold for approximately $78,000 per lot, i.e., $1.8 million. At the end of this period (i.e., August 1989), the Chestnut Woods

29

project was appraised at $2.7 million. It is undisputed that Red Hawk had significant net worth throughout this period.

The district court found it significant that Red Hawk and its partners understood that site improvements were on-going during the period from January to July 1989 and that the Chestnut Woods joint venture was, accordingly, incurring liabilities. It did not find, however, that this joint venture was insolvent during this period. To the contrary, the record relevant to this period indicates that the liabilities of the Chestnut Woods joint venture did not exceed $1.7 million, that it thus remained solvent, and that trade creditors were being paid on a current basis. In particular, all invoices that were submitted to Cedar Ridge by Henkels during this period were paid in full.

New Jersey's Uniform Limited Partnership Law provides that a partner may not receive a distribution from a limited partnership "to the extent that, after giving effect to the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests, exceed the fair value of the partnership assets." N.J. Stat. Ann. S 42:2A-45. This is the sole mandatory restriction in the law for the benefit of partnership creditors on distributions to partners. Any additional restriction for the benefit of creditors must thus be one voluntarily undertaken by the Red Hawk partners in their partnership agreement.

Our court today holds that the Red Hawk partners, although mandating a pass-through to themselves of cash receipts, intended in Section 12(a) of their partnership agreement voluntarily to impose on themselves a very significant restriction for the benefit of joint venture creditors. This voluntary restriction, the court holds by necessary implication, was intended to be sufficiently broad that a distribution could not be made to Red Hawk partners unless cash reserves had been established to fund the payment of all anticipated future liabilities of the joint venture partnerships (owned in part by others) that might accrue over some unspecified period of time, even though those other partnerships were expected to pay their own liabilities with their own or borrowed funds. The record suggests no reason, however, why the partners, when

30

setting up the Red Hawk partnership, would have imposed such an unnecessary and ill-defined burden on themselves, and the text of Section 12(a) does not require such a conclusion that they did.

The court resolves the central issue in this appeal in one sentence: Section 12(a)(iv) "of the Red Hawk partnership agreement specifically provided that cash receipts be used for the establishment of reasonable reserves (for creditors) before such receipts be distributed to the [limited partners]." Slip opinion at 10. Because Red Hawk's general partner had reason to believe that Henkels might submit invoices in the future for site improvement work, the court accordingly concludes that the three challenged distributions violated Section 12(a)(iv).

In my view, the court errs for at least five reasons: (1) In context, Section 12(a)(iv) was intended for the protection of the limited partners, not as a creditor protection device even for creditors of Red Hawk; (2) Section 12(a)(iv), even if viewed as a creditor protection provision, was not intended for the protection of joint venture creditors for whom the joint ventures were to make other provision; (3) the challenged distributions were a return of capital that the partners had agreed to devote to an abandoned venture, and it is not reasonable to find an intent in Section 12(a)(iv) to commit that capital contribution to the creditors of a different, fully capitalized venture; (4) Section 12(a)(iv) permits the general partner to retain reserves only from "Cash Receipts derived from the operations of the Property" and the challenged distributions did not come from funds generated by operations;1 and (5) even if Section 12(a)(iv)

_____

1. The district court correctly found that the three payments representing a return of the capital committed to the Timber Knoll joint venture did not constitute a "cash receipt from the operations of the Property." It inexplicably concluded from this, however, that the general partner was thus "plainly obligated" to follow the terms of Section 12(a)(iv) and establish a reserve for anticipated future liabilities to Henkels. At the time the Red Hawk partnership agreement was negotiated, the parties were not, of course, anticipating the abandonment of the Timber Knoll venture, and the"notwithstanding" clause does not literally read as applying to a return of capital that does

31

could reasonably be read to require Red Hawk's general
partner to set aside funds for creditors in Henkels' position
whenever a reasonable general partner exercising business
judgment would do so, this record provides no basis for a
conclusion that the failure of Red Hawk's general partner to
set aside funds for Henkels in January through July of
1989 was a decision beyond the bounds of business
judgment.

I would reverse and remand with instructions to enter
judgment for the defendants.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

not result from a sale of the joint venture property. Nevertheless, I
believe the intent behind the provision governing such sales, and the
provisions strictly limiting the objectives of the partnership to
participation in specified joint ventures with specified capitalization,
required a pass-through of the payments from the Timber Knoll joint
venture. But whether or not this is the case, Ifind no authority in the
agreement for the establishment of reserves other than out of operating
revenues.